IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RONALD D. MADDEN,<br><br>    Plaintiff,<br><br>vs.<br><br>ANTON ANTONOV & AV TRANSPORTATION, INC., and BNSF RAILWAY COMPANY,<br><br>    Defendants. | 4:12-CV-3090<br><br>MEMORANDUM AND ORDER |

  This matter is before the Court on several motions *in limine* filed by defendant BNSF Railway Company. Filings 199, 202, 205, and 208. The facts underlying this dispute are discussed separately in the Court's accompanying Memorandum and Order denying BNSF's motion for summary judgment. For the reasons discussed below, each of BNSF's motions will be granted in part and denied in part.

### I. STANDARD OF REVIEW

  BNSF has moved to limit or exclude the testimony of several of plaintiff Ronald D. Madden's expert witnesses, as well as the testimony of one lay witness. The opinion of a qualified expert witness is admissible if (1) it is based on sufficient facts or data, (2) it is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The expert's scientific, technical, or specialized knowledge must also assist the trier of fact to understand the evidence or determine a fact in issue. *Id*. The Court acts as a gatekeeper, ensuring that any expert testimony or evidence is not only relevant, but reliable. *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012).

  When determining the reliability of an expert's opinion, the Court examines the four following non-exclusive factors: (1) whether the theory or technique applied can be tested, (2) whether the theory or technique has been subject to peer review or publication, (3) the known or potential rate of error, and (4) whether it is accepted in the relevant discipline. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–95 (1993). These factors are not exhaustive or limiting, and the Court must use the factors as it deems

appropriate to the facts of each case. *Presley v. Lakewood Eng'g and Mfg. Co.*, 553 F.3d 638, 644 (8th Cir. 2009). In addition, the Court can weigh whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case. *Id.* The standard for judging reliability is lower than the merits standard of correctness. *Kuhn,* 686 F.3d at 625. And "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

Lay opinions are governed by Fed. R. Evid. 701. Under Rule 701, lay opinion cannot be based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Fed. R. Evid. 701(c). In other words, lay testimony "results from a process of reasoning familiar in everyday life," as opposed to "a process of reasoning which can be mastered only by specialists in the field." Fed. R. Evid. 701 Adv. Comm. Notes. Otherwise, to be admissible, a lay opinion need only be (1) rationally based on the witness's perception and (2) helpful to clearly understanding the witness's testimony or to determining a fact in issue. Fed. R. Evid. 701.

## II. ANALYSIS
### A. Loumiet

Madden's first expert witness is James R. Loumiet, an engineer with experience in, among other things, train accident reconstruction. Loumiet would testify that the County Road 429 ("CR 429") crossing was extra-hazardous, based on several factors, and that BNSF should have taken certain remedial steps to enhance safety at the crossing. BNSF argues that Loumiet's testimony should be excluded because, among other things, (1) it rests upon theories precluded by the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20101, *et seq.*; (2) Loumiet is not qualified to render an opinion on the design of a grade crossing; and (3) various reasons that Loumiet has given for his opinion that the crossing was hazardous are irrelevant and lack sufficient foundation. With a handful of exceptions, the Court finds BNSF's arguments to be unpersuasive.

BNSF's first two arguments are quickly resolved. First, for the reasons explained in the Court's accompanying Memorandum and Order denying BNSF's motion for summary judgment, FRSA has no preclusive effect in this case. BNSF's second argument is that Loumiet is unqualified because he is not a licensed professional engineer with experience in traffic engineering. As support, BNSF points to the opinion of its expert, Joseph D. Blaschke (who

- 2 -

happens to be a traffic engineer). However, Rule 702 does not require that one party's expert be of the identical specialty as the other party's expert. *Robinson v. GEICO General Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006). Instead, Rule 702 only requires that an expert possess the knowledge, skill, experience, training, or education sufficient to assist the trier of fact, which is satisfied where expert testimony advances the trier of fact's understanding to any degree. *Id.* The Court finds that Loumiet's experience in train accident reconstruction qualifies him to express an opinion as to whether and why the CR 429 crossing was hazardous.

BNSF's remaining arguments are, for the most part, iterations on a theme: that the specific reasons Loumiet gave for concluding that the CR 429 crossing was hazardous are irrelevant or not supported by sufficient foundation. Loumiet explained that, in his opinion, the following factors rendered the crossing exceptionally dangerous: (1) the presence of two sets of main line tracks; (2) "unusually restricted sight distance" caused by the crossing's geometry; (3) a high volume of train traffic; (4) increased traffic at the crossing, and in particular, its use by heavy vehicles such as defendant Anton Antonov's tractor-trailer; (5) use of the crossing by high-speed trains; (6) the "[s]teep and humped" profile of the crossing and its "rough and uneven" surface; and (7) the lack of active warning devices at the crossing. Filing 198-5 at 156–58.

The Court has examined each of BNSF's arguments as to these factors, but finds it unnecessary to discuss all of them. It is not that BNSF's arguments are entirely lacking in merit or persuasive value. For example, Loumiet explained that the presence of two tracks made the crossing more dangerous because a train on the near track could potentially obscure a motorist's view of a train on the second track. As BNSF points out, this explanation is not tied to the facts of this case—on the current record, it does not appear that the first train actually obscured Antonov's view of Madden's train. But BNSF's remaining arguments, while not entirely unpersuasive, do not fatally undermine the reliability of Loumiet's methodology or opinion. The Court will provide two examples.

First, BNSF disputes the methodology Loumiet utilized to measure the angle of the crossing that Antonov would have perceived. BNSF argues that Antonov had "unlimited sight distance" when he was driving on Highway 2, which paralleled the tracks. But that has no bearing on Loumiet's measurements of the angle a driver would perceive when stopped in front of the tracks. BNSF next points to an excerpt from Antonov's deposition which, BNSF claims, would show that Antonov had an opportunity to "square up" his truck with the tracks. Filing 203 at 15–16 (citing Antonov deposition at 79–80). But the deposition transcript provided by BNSF is lacking pages 79

and 80. *See* 198-5 at 66–67. BNSF also attacks Loumiet's assumption that Antonov's truck would have been parallel with CR 429. But that appears to be a reasonable assumption to the Court, and BNSF has not produced any evidence to suggest otherwise.

Second, BNSF objects to Loumiet's reliance on certain figures from the U.S. Department of Transportation, which he used in determining the average number of trains that pass through the crossing each day. BNSF correctly asserts that data which was compiled by states to comply with the Federal Highway Administration's crossing program is inadmissible for any purpose, including as the basis for an expert's opinion. *See,* 23 U.S.C. § 409; *Lusby v. Union Pac. R. Co.,* 4 F.3d 639, 641 (8th Cir. 1993). Assuming that these figures do fall within § 409—which BNSF has claimed, but not shown—the objection is nonetheless moot. As BNSF admits, Loumiet obtained similar traffic figures from an admissible source: the testimony of BNSF employee Mark Craney. *See* filing 203 at 21.

In sum, BNSF has not convinced the Court that Loumiet's methodology, reasoning, data, or assumptions are so unreliable as to render his opinion unhelpful to the jury. And as a general rule, the factual basis for an expert's opinion goes to the credibility of his testimony, not the admissibility. *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 955 (8th Cir. 2007). BNSF's critiques of Loumiet's opinion and reasoning can be adequately deployed in cross-examination. *See id.*

BNSF has also objected to Loumiet's proposed testimony that BNSF should have implemented certain remedial measures at the crossing, and that such measures could have prevented the collision with Antonov's truck. *See* filing 198-5 at 6. Loumiet opined that BNSF should have (1) closed the crossing; (2) installed flashing light signals and automatic crossing gates; (3) stationed flaggers at the crossing; (4) realigned the approaches to the crossing to be perpendicular with the tracks; (5) leveled the approaches; and (6) repaired the crossing surface. The Court finds merit to some, but not all, of BNSF's objections on this point.

As to the first remedial measure, BNSF had produced evidence that it lacked the authority to close the crossing. Loumiet admitted in his deposition it is up to the State of Nebraska to approve any crossing closure. Filing 198-5 at 134. Madden has not produced evidence to the contrary. And there is no evidence that BNSF had authority over public roads such that it could have closed CR 429. BNSF cannot be found negligent for failing to do something it could not have done. Therefore, this proposed remedial measure lacks

relevance, and Loumiet will be prohibited from testifying that BNSF should have closed the crossing.[1]

Similarly, as to the fourth and fifth remedial measures, BNSF argues that it lacked the authority to realign and level the approaches to the crossing, i.e., CR 429. Loumiet admitted that the county government bears responsibility for making changes to CR 429. Filing 198-5 at 136–37. Madden has presented no evidence to the contrary. Therefore, Loumiet will be prohibited from testifying that BNSF should have levelled or realigned the approaches to the crossing.[2]

BNSF's arguments with regard to the second and third remedial measures—installing lights or gates, or using flaggers—are less persuasive. As discussed above, FRSA does not preclude Madden from arguing that BNSF should have taken such precautions. BNSF also asserts that under *Packard v. Darveau*, 759 F.3d 897, 903 (8th Cir. 2014), it had no duty to flag the crossing with human flaggers because that would amount a duty to regulate traffic on public roadways. The Court has addressed this argument in its Memorandum and Order denying BNSF's motion for summary judgment. Briefly stated, the Court is not convinced. It is not disputed that, if the crossing was sufficiently hazardous, then BNSF had a duty to provide lights or gates. In other words, under certain circumstances, BNSF already had a duty to control traffic at the crossing. Whether BNSF bears such a duty does not turn on the means it might employ to fulfill the duty.[3]

---

[1] Madden counters that BNSF should have petitioned the relevant government authority to close the crossing. The Court need not decide if the law imposes such a duty, because Madden has produced no evidence to suggest that such a petition would have resulted in the crossing being closed. Rather, the evidence shows that BNSF advocated for closing the crossing, but faced opposition from local authorities. *See, e.g.*, filing 228-3 at 34; filing 228-1 at 85–86.

[2] This is not to say that Loumiet will be prohibited from testifying that the nature of the crossing's approaches contributed to its hazardous nature. *See* filing 198-5 at 157. Factors affecting crossing safety that were beyond BNSF's control, but of which BNSF knew or should have known, are still relevant to determining any potential negligence.

[3] In its motion, but not its brief, BNSF also objects to Loumiet's opinion that BNSF knew or should have known of the hazardous nature of the crossing due to the construction occurring at The Andersons' adjacent grain facility. BNSF asserts that this opinion lacks foundation, is irrelevant, and improperly imposes upon BNSF the duty to control the behavior of unrelated third parties. Filing 202 at 5. The Court is not persuaded. BNSF does not identify what foundation is missing. The opinion is relevant; BNSF does not dispute that it was aware of The Andersons' construction activity, and any knowledge by BNSF of increased traffic at the crossing is relevant to whether BNSF should have foreseen an accident at the crossing. And *Packard* only stands for the proposition that some private parties have no duty to control traffic. As the Court has already explained, there are

The Court will also permit Loumiet to testify that BNSF should have repaired the crossing surface. The crossing surface may, or may not, have been "rough and uneven," and this may, or may not, have resulted in some additional delay in Antonov crossing the tracks. That remains a question of fact for the jury to determine. But if the jury finds that the rough surface contributed to the collision, they are entitled to consider whether repairing the surface might have helped avoid or mitigate the collision. In sum, Loumiet may opine that BNSF should have provided gates or lights, or flagged the crossing, or that it should have repaired the crossing surface (all subject to cross-examination); but he may not testify that BNSF should have closed the crossing or re-aligned or leveled the approaches.

Finally, BNSF has moved to exclude Loumiet's opinion that BNSF knew or should have known of the hazards presented by the CR 429 crossing based on an unrelated May 6, 2007 train collision near Ansley, Nebraska (a town about 40 miles southeast of Anselmo). That collision also involved a large truck and occurred on the same rail line. And according to Loumiet, that crossing also had an acute crossing angle that restricted the truck driver's ability to see an oncoming train. Filing 198-5 at 159.

Evidence of other accidents may be relevant to showing a defendant's notice of danger, but only if the proponent of the evidence shows that the other accident was substantially similar. *See Drabik v. Stanley-Bostitch, Inc.*, 997 F.2d 496, 508 (8th Cir. 1993). BNSF contends that Madden has failed to show the May 2007 accident occurred under substantially similar circumstances. Based on the current record, the Court would reach the same conclusion. Before the Court can determine if the previous collision was substantially similar, it needs more information regarding the circumstances of the collision. More specifically, the Court needs some evidence that the acute crossing angle bore some causal relationship to the prior accident, and that it was not the result of other, unrelated variables. BNSF further contends that, having failed to show substantial similarity at this time, Madden should be precluded from doing so at trial. The Court disagrees. It is not possible to pre-adjudicate every single aspect of this case before trial has even begun. It is Madden's burden to prove substantial similarity, but he will be given an opportunity to do so at trial.

## B. Wilson

Madden's next expert is Marc B. Wilson, an engineer and ergonomist. Wilson has submitted a report stating, and would testify to the effect that,

---

reasons to doubt *Packard's* applicability to railroads, when the hazards to be prevented are taking place on the railroad's crossings.

BNSF could and should have trained Madden how to respond to an imminent grade crossing collision, and that if BNSF had done so, (1) Madden would not have "froze" and panicked, and therefore (2) Madden would have been able to assume a secure, braced position that would have reduced his injuries. Filing 198-5 at 101–05. Wilson also opines more generally that "training minimizes injury." Filing 228-5 at 22; *see also* filing 198-5 at 105. The Court finds as follows. Wilson will be permitted to testify that, with proper training, Madden potentially would not have panicked. But Wilson will not be permitted to testify that Madden would, in fact, have been able to assume a safe position. Nor may Wilson offer his general opinion that "training minimizes injury."

Wilson's opinion that Madden would have been able to assume a safe position must be excluded because it is not based on sufficient facts or data, and it does not result from any application of Wilson's expertise. *See* Fed. R. Evid. 702. In his deposition, Wilson admitted that he is not familiar with the layout of a train's cab. Filing 198-5 at 80–81. And Wilson admitted that because he had not actually performed an analysis of the cab (ergonomic or otherwise) he could not determine what a safe position would have been. Filing 198-5 at 79–84. As the following exchange shows, Wilson lacked any reliable data or basis upon which to express an opinion on Madden's ability to assume a safe position:

> Q [by BNSF's attorney]: And since you don't know where the safest position would be, you're unable to tell us, with any degree of reasonable scientific certainty, that it would have made a difference on Mr. Madden's injuries in this case, to be in a different position.
>
> . . . .
>
> [WILSON]: Yeah. I don't know that answer because, first of all, I wasn't even asked to look at it. I was asked to look at [whether they] were . . . trained to do anything. And I was asked to look at the facts; that the training officer says they don't train in this; that the engineer said the conductor froze. That's all I was given to look at.

Filing 198-5 at 82. Expert testimony must be based upon more than subjective belief or unsupported speculation; rather, it must be supported by "good grounds." *Daubert*, 509 U.S. at 590. This aspect of Wilson's testimony is not based on good grounds and must be excluded.

Wilson's broader opinion, that "training minimizes injuries" will also be excluded. As a general matter, this proposition is no doubt true. But Wilson has not sufficiently connected this proposition to the facts of this case. *See Presley*, 553 F.3d at 644. As just discussed, Wilson has no basis to opine on whether Madden's injuries could have been reduced. So, there is no reason to believe that this general proposition actually applies to the facts of this case. And without any real connection to the facts of this case, this opinion is too broad to offer any assistance to the jury. For that matter, Wilson has not conducted any testing or studies to determine the extent to which training actually reduces injuries in the context of grade crossing collisions.

However, Wilson may testify that, with training, Madden potentially would not have panicked (subject, of course, to cross-examination). Wilson's experience qualifies him to render this opinion, and BNSF does not seriously contend otherwise. Nor is this opinion subject to the same reliability problems as Wilson's first opinion. But the relevance of this opinion depends upon Madden producing evidence of two other matters: (1) that Madden could have placed himself in a secured, braced position, such that he would not have been thrown about the cab as severely; and (2) that he would have done so, had he not panicked. If Madden produces such evidence, then Wilson's opinion that, with training, Madden would not have panicked, would be relevant and could assist the jury (subject to cross-examination).

### C. Drs. Gonzales and Machanic

Madden's next expert witnesses are two of his treating physicians, Dr. Kristen L. Gonzales, a general family physician, and Dr. Bennett I. Machanic, a neurologist. They would testify, generally, that had Madden been braced or otherwise been secured in his cab at the time of the accident, he would have suffered less blunt force trauma from being hurled about the cab and thus less severe injuries. Filing 198-5 at 181, 195.

BNSF asserts that both doctors' opinions are unreliable and should be excluded, because they relied upon assumptions about the equipment in the cab that do not reflect Madden's theory of the case. In their depositions, both doctors admitted that they assumed Madden would be secured or braced with a seatbelt. *See* filing 198-5 at 162–63, 187–88. But Madden concedes he is not claiming that the cab should have been equipped with seatbelts. *See* filing 231 at 7. Instead, Madden is arguing that with a proper warning or better training, he would not have panicked and would have been able to place his body in a secure, braced position, and thereby avoided injury, like his fellow occupant in the cab, Brad Tyree. Neither doctor is qualified to offer an opinion as to the feasibility of this body-positioning theory. So, BNSF

contends, their opinions should be excluded as unreliable and outside their areas of expertise.

As with Wilson, the Court will grant BNSF's motion in part and deny it in part. Doctors Gonzales and Machanic may not testify as to the feasibility or efficacy of any safety maneuver Madden could have executed. But they are qualified to offer their more general opinions that less blunt force results in less physical trauma. There is nothing unreliable about this proposition. And while the alleged cause of Madden's injuries is obvious—being hurled around a train cab upon a sudden impact—the injuries are serious and varied enough that these physicians' opinions will assist the jury.

### D. Cantrell

BNSF's final challenge is to a lay witness of Madden's, Donald Cantrell. Cantrell is a farmer who lives near the CR 429 crossing. Cantrell owns several semi-tractor/trailers that he uses to carry grain, and he has experience driving them across the CR 429 crossing. Cantrell would testify that in his experience traversing the crossing from the south, its angle is such that in order to see a train coming from the east, he has to move over to his passenger seat. Cantrell would also testify that because the approach to the crossing from the south is short, and CR 429 is narrow, it is difficult for a large truck to "square up" with the tracks. Filing 198-5 at 217. Based on this and other factors he has personally observed, Cantrell would testify that the crossing is dangerous. Filing 228-1 at ¶¶ 1, 6, 11. Cantrell would also testify that the crossing should be improved, by taking steps such as relocating and realigning Highway 2, leveling the approaches to the crossing, and installing automatic crossing gates. Filing 228-1 at ¶ 11; filing 198-5 at 217–18.

BNSF argues that Cantrell's testimony should be excluded as Cantrell is attempting to offer what amounts to expert opinion in the guise of lay testimony. For the most part, the Court is not persuaded. Cantrell's opinion that the CR 429 crossing is dangerous is rationally based on his experience and perceptions in traversing the crossing. The "'prototypical example[s] of the type of evidence contemplated by . . . Rule 701'" include opinions "'relat[ing] to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.'" Fed. R. Evid. 701 Adv. Comm. Notes (quoting *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995)). The angle of a crossing, its general layout and geometry, and the precautions necessary to traverse it safely are similarly within the realm of "reasoning familiar in everyday life." Fed. R. Evid. 701 Adv. Comm. Notes.

However, Cantrell may not testify as to what remedial measures BNSF should have taken to make the crossing safer. When it comes to realigning state highways and similar feats of civil engineering, Cantrell is exiting the realm of permissible lay opinion.

> "It is absurd to contend that the average layman has, as a matter of common knowledge, a sufficient grasp of the diverse factors which must be considered in constructing and maintaining an acutely angled railroad crossing which will afford a maximum of safety and a minimum of inconvenience to vehicular traffic and train movement."

*Young v. Ill. Cent. Gulf R. Co.*, 618 F.2d 332, 338 (5th Cir. 1980) (quoting *Bridger v. Union Railway*, 355 F.2d 382, 389 (6th Cir. 1966)). In short, Cantrell may testify as to matters based on his personal experience and perceptions, but not to specific remedial measures that exceed the scope of his experience and perceptions.[4]

THEREFORE, IT IS ORDERED:

1. BNSF's motions in limine (filings 199, 202, 205, and 208) are each granted in part and denied in part, as set forth above.

Dated this 17th day of February, 2015.

BY THE COURT:

*/s/ John M. Gerrard*
John M. Gerrard
United States District Judge

---

[4] In its reply brief in support of its motion to limit Cantrell's testimony, BNSF also asks the Court to limit the testimony of various other lay witnesses that the CR 429 crossing is dangerous. The foregoing analysis applies equally to these witnesses. If their observations are based on personal experience, they are admissible. But if the witnesses seek to propose specific solutions that require engineering or other expertise, their testimony will be stricken.